J-S12013-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: B.M.W., MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.A.W., FATHER | |
| | No. 2560 EDA 2015 |

Appeal from the Decree July 14, 2015
In the Court of Common Pleas of Bucks County
Orphans' Court at No(s): 2013-9130

BEFORE:  MUNDY, J., OLSON, J., and STRASSBURGER, J.[*]

MEMORANDUM BY MUNDY, J.:                    **FILED MARCH 02, 2016**

Appellant, L.A.W. (Father), appeals from the July 14, 2015 decree involuntarily terminating his parental rights to his son, B.M.W., born in March 2012.[1]  After careful review, we affirm.[2]

We summarize the factual and procedural history as follows.  In April 2012, shortly after B.M.W.'s birth, he was placed in the care and custody of the Bucks County Children and Youth Social Services Agency (the Agency) due to Mother's illegal drug use during B.M.W.'s gestation.  Orphans' Court

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] B.M.W.'s mother, E.P. (Mother), voluntarily relinquished her parental rights on July 7, 2015, and she is not a party to this appeal.

[2] The Guardian *Ad Litem* has filed a brief in support of the involuntary termination decree.

Opinion, 10/8/15, at 1; N.T., 9/2/14, at 9. B.M.W. was adjudicated dependent on July 25, 2012. *Id.*

Father became incarcerated approximately three weeks after B.M.W.'s birth. Orphans' Court Opinion, 10/8/15, at 5. Father pleaded guilty to crimes related to the possession of illegal drugs, and he was sentenced to a term of incarceration of two to four years. *Id.* at 5, 6. Father's maximum date of incarceration is March 27, 2016. *Id.* at 5, n 3.

On November 22, 2013, the Agency filed petitions for the involuntary termination of Father's and Mother's[3] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). A hearing occurred on September 2, 2014, during which the following witnesses testified: Mother; Father;[4] Therese Alimi, the Agency caseworker; and D.N.D., Father's sister. Importantly, the orphans' court found that Ms. Alimi testified, "the Agency's major concern as to Father's ability to care for B.M.W. is Father's mental health." *Id.* at 7.

> Ms. Alimi testified that the Agency received mental health reports from various providers concerning Father; however, Father steadfastly maintained that he did not have mental health issues and he refused to participate in a mental health assessment or

---

[3] Mother ultimately decided to voluntarily relinquish her parental rights.

[4] Father was on parole and residing in a halfway house during the subject proceedings. Father testified that he had been residing in the halfway house since May 12, 2014. N.T., 9/2/14, at 46-47; Orphans' Court Opinion, 10/8/15, at 8.

> mental health treatment. During a telephone call with Ms. Alimi's supervisor on January 10, 2013, Father reported that the prison had prescribed Xanax for him but that since December 24, 2012, he had been flushing it down the toilet.
>
> Ms. Alimi testified … the Agency maintained the [Family Service Plan] Objective of medication for Father's mental health because the "discharge psych evaluation" included that recommendation from the expert. Ms. Alimi and her supervisor both told Father that he had the right to obtain a second opinion, since he disagreed with the conclusions of the mental health evaluations the Agency have received. Father never did so.

Orphans' Court Opinion, 10/8/15, at 7 (citations to record omitted).

In short, the orphans' court found, "it was established that Father had been consistently uncooperative with the Agency and unwilling to sign releases sought by the Agency regarding his medical, employment and housing histories and status." *Id.* at 9. However, the orphans' court explained that, "based upon Father's own adamant testimony about his mental health and his desire to parent [B.M.W.]," it directed as follows by decree dated September 5, 2014.

> 1. The Petition as to Father is held in abeyance for a period of four (4) months subsequent to the date of this Order, wherein Father may comply with the following conditions:
>
> > a. Undergo a thorough mental health evaluation to be performed by a Board–certified mental health professional;
> >
> > b. Assuming there are treatment recommendations made by the mental health professional, comply with any and all such

- 3 -

treatment; and comply with all treatment recommendations;

c.    Within ten (10) days of the date of this Order, sign any and all releases, reasonably requested by the Agency, allowing the Agency to fully investigate Father's medical history, employment history and status; and ability to provide suitable and stable housing for his child;

d.    Continue with steady employment and continue efforts to achieve full time employment status.

Orphans' Court Order, 9/5/14, at ¶ 1(a–d) (hereinafter Interim Decree).  In addition, the orphans' court directed, "[f]ollowing expiration of the aforesaid four (4) month time period, the Agency may file for a hearing to complete the evidentiary record …."  *Id.* at ¶ 2.

A second termination hearing was held seven months later, on April 14, 2015, during which the Agency presented the testimony of its caseworkers, Desiree Mullen and Taunya Ciambotti, and Father testified on his own behalf.  By decree dated July 7, 2015, and entered on July 14, 2015, the orphans' court terminated Father's parental rights.

On August 11, 2015, Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i).  The orphans' court issued its opinion pursuant to Rule 1925(a) on October 8, 2015.

On appeal, Father presents the following issues for our review.

    A. Was the [orphans'] court's [d]ecree based on insufficient evidence and should [Father's] parental rights not have been terminated[?]

    B. Was Father's incarceration wrongfully used against [him] in making the determination to terminate his parental rights[?]

Father's Brief at 4.

We consider Father's issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination

delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

This Court need only agree with any one subsection of Section 2511(a), along with Section 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Instantly, we conclude the orphans' court properly terminated Father's parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows.

### § 2511. Grounds for involuntary termination

**(a) General Rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary

- 6 -

for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). Further, this Court has stated that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *Id.* A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court addressed the relevance of incarceration in termination decisions under Section 2511(a)(2). The *S.P.* Court held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." *S.P.*, *supra* at 828.

With respect to Section 2511(b), the requisite analysis is as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

In his first issue on appeal, Father argues that the evidence was insufficient to support the termination of his parental rights. Specifically,

Father asserts, "[s]ince his release to a halfway house he has continued to maintain [a] relationship with [B.M.W.] while the Agency has done nothing to promote reunification." Father's Brief at 8. Further, Father baldly asserts that the orphans' court held the Agency to a "lower standard" than the one to which it held him because the Agency failed to provide releases for him to sign within ten days of the Interim Decree. *See* Orphans' Court Order, 9/5/14, at ¶ 1(c). Nevertheless, Father asserts that he complied with the Interim Decree by receiving a mental health evaluation at Penndell Mental Health, and that he signed a release for the Agency to receive the evaluation. Father's Brief at 9. In his second issue, Father argues that the orphans' court abused its discretion in terminating his parental rights by failing to apply the standard for incarcerated parents. Father's Brief at 12. Father argues that, while in prison, he maintained contact with B.M.W. *Id.* In addition, Father argues that he has a plan for B.M.W. to live with D.N.D., his sister. *Id.*

The orphans' court supplied the following reasoning with respect to the testimonial evidence presented on April 14, 2015. Following the Interim Decree, Taunya Ciambotti, the Agency caseworker, met with Father on October 21, 2014, which was more than six weeks later. Orphans' Court Opinion, 10/8/15, at 9. During the meeting, Ms. Ciambotti provided Father with five releases, "including releases for Express Personnel Services, the temporary employment agency Father claimed he was utilizing; the

Pennsylvania Board of Probation and Parole; Norristown State Hospital; the Bucks County Correctional Facility; and Self-Help Movement, the halfway house where Father resided upon his discharge from incarceration." *Id.* at 10 (citations omitted). Further, "Father left that meeting in October, 2014 with the original copy of each release, indicating to Ms. Ciambotti that he wanted to speak with his attorney before he signed the releases." *Id.* (citation omitted). The orphans' court continued:

> Father testified that in voluntarily complying with a portion of [the orphan's court's I]nterim Decree … he presented at Penndel Mental Health and underwent an evaluation with Dr. Grossman, which was followed by one (1) therapy session. Neither the testimony of Dr. Grossman, in person or by telephone, nor any report authored by Dr. Grossman, was offered at the hearing. Father stated that on December 19, 2014, he signed an Agency release for his records maintained by Penndel Mental Health.
>
> Father testified that in addition to the Penndel Mental Health release, he also provided a release to his parole officer. Despite seven (7) months of opportunity having elapsed between the two evidentiary hearing dates, Father claimed that on the Tuesday following the April 14, 2015 evidentiary hearing, he would be undergoing a drug and alcohol assessment.
>
> As for the other unsigned [r]eleases sought by the Agency, Father testified that he wanted to confer with his attorney, but upon realizing he received the releases beyond ten (10) days from the date of th[e] [c]ourt's [I]nterim Decree of September 5, 2014, "I figured why should I sign off after the 10 days." Such was Father's reasoning for his lack of cooperation, despite the fact that he signed the mental health release in December 2014, three (3) months after the … Interim Decree. Father testified

- 10 -

> further that he never discussed the releases with his attorney because he "was too busy trying to find a job. Trying to find full-time employment so that everything would fall into place." Father testified on April 14, 2015 that he was willing to sign all of the releases sought by the Agency.

Orphans' Court Opinion, 10/8/15, at 10-11 (citations omitted).

The orphans' court stated that, "[a]s a whole, [it] did not find Father's testimony credible." *Id.* at 11. Further, the orphans' court found that "Despite th[e orphans' c]ourt's efforts to afford Father additional time to do so, Father remained unwilling or incapable of appreciating the need to meet reasonable Agency Objectives." *Id.* at 12. The testimony of Ms. Ciambotti and Father supports the foregoing findings by the orphans' court.

Upon careful review, we conclude Father's arguments on appeal have no merit. Contrary to his assertions, the testimonial evidence overwhelmingly supports the involuntary termination of Father's parental rights pursuant to Section 2511(a)(2). Indeed, Father's continued neglect or refusal to sign the releases and cooperate with the Agency's objectives regarding his mental health, employment, and housing has caused B.M.W., since birth, to be without essential parental care, control, or subsistence necessary for his physical or mental well-being. Therefore, we discern no abuse of discretion by the orphans' court in concluding that the causes of Father's incapacity, neglect, or refusal cannot or will not be remedied. ***See T.S.M.*, *supra***.

With respect to Section 2511(b), our Supreme Court stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268. Moreover, the Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail … the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, the record includes no evidence of a parent-child bond between Father and B.M.W. Specifically, the orphans' court found as follows.

> We found termination was warranted here. While we do not doubt that Father loves [B.M.W.], the record is essentially devoid of any credible testimony or evidence of a relationship between Father and [B.M.W.], the existence of which would result in a negative effect on [B.M.W.] should Father's rights be terminated.

Orphan's Court Opinion, 10/8/15, at 14. As such, it was reasonable for the orphans' court to conclude that no bond exists. *See generally J.M.*, *supra*. Further, the orphans' court concluded that a bond exists between B.M.W. and his foster mother.

> [B.M.W.] has been placed with his current foster family since March 22, 2013. [B.M.W.] is in a single-

> parent foster home with another child who is 13 years old. [B.M.W.] has a wonderful relationship with his foster mother, with whom he is affectionate and who he refers to as "momma." [B.M.W.] refers to the older son as his brother. [B.M.W.] enjoys substantial interaction with the extended family and is treated as if he was born into that family. [B.M.W.] is on track developmentally at his daycare program, and is being observed in order to monitor his developmental milestones. Foster mother is an adoptive resource for [B.M.W.].

Orphans' Court Opinion, 10/8/15, at 13. The testimony of Ms. Alimi supports the orphans' court's findings. Based on our review of the totality of the record evidence, we conclude that involuntarily terminating Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of B.M.W. Therefore, we discern no abuse of discretion by the orphans' court with respect to Section 2511(b). **See T.S.M.**, **supra** at 267.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to B.M.W. Accordingly, we affirm the orphans' court's July 14, 2015 decree involuntarily terminating Father's parental rights.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>3/2/2016</u>